**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X

SHARON FILICHKO,

                                        Plaintiff,                    **15-CV-00525 (AJN)(SN)**

                    -against-                                         <u>**REPORT AND**</u>
                                                                      <u>**RECOMMENDATION**</u>
CAROLYN COLVIN,

                                        Defendant.

----------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __  4/27/2016
```

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE ALISON J. NATHAN:**

      Sharon Filichko seeks review of the Commissioner of Social Security's denial of her

application for Supplemental Security Income. Filichko claims that a combination of an

ankle injury, knee cyst, and bipolar disorder prevent her from working in any capacity. An

Administrative Law Judge found that the medical evidence did not support Filichko's

account of her symptoms' severity, rejected the opinion of a treating source who supported

Filichko's claims, and credited the testimony of a consultative examiner who believed that

Filichko could work within specified limitations. The ALJ found that Filichko's physical

impairments limited her to sedentary work, and concluded that her mental impairments

would not preclude her from all work in that category.

      Filichko and the Commissioner cross-move for judgment on the pleadings under Federal

Rule of Civil Procedure 12(c). I conclude that the ALJ's determination was supported by

substantial evidence and free from legal error. I recommend granting judgment in favor of the

Commissioner and denying Filichko's motion.

# BACKGROUND

## I.     Evidence Before the ALJ

On February 4, 2011, Filichko applied for Social Security disability benefits claiming that bipolar disorder, a fractured left heel and ankle, and polysubstance abuse prevented her from working in any capacity. The Social Security Administration denied her initial application, and she requested a hearing before an ALJ. The following summarizes the evidence heard by the ALJ and later submitted to the Appeals Council.

### A.     Filichko's Testimony

Filichko testified that she suffered from bipolar disorder, which caused severe panic attacks, lost sleep, and claustrophobia. Administrative Record ("AR") at 40. She was "very antsy" and, when she sat down to read, she would get "very fidgety," causing her to read very slowly. Id. at 44. She took methadone to control her heroin addiction and abstained from alcohol, but had recently been convicted of driving while intoxicated. Id. at 40-41. She received mental health treatment regularly and participated in addiction recovery groups. Id. at 41-43. She drove infrequently before receiving the DWI, and would occasionally drive to a lake during panic attacks so that she could relax on a float. Id. at 46-47. Her panic attacks were brought on by memories of childhood sexual abuse. Id. at 47-48. "Small environments, situations with a lot of people around" also triggered panic attacks. Id. at 48. She did not "consider anybody a friend" because she did not "trust anybody now." Id. at 48. Her bipolar disorder prevented her from getting out of bed or picking up the phone. Id. at 48-49. Yet, she could still cook, do laundry, and shop. Id. at 38-39. To shop, she would either take public transportation or get a ride with a friend. Id. at 39.

Filichko broke her ankle and foot in a fall. Id. at 49-50. After the ankle and foot were repaired, she continued to experience pain and required a second surgery to remove a screw. Id. at 49-50. She recently reinjured her ankle by twisting it in the sand. Id. at 50. She used walking boots and a cane. She used the cane when she had to walk more than 20 feet and would not be able to walk 80 feet without it. Id. at 50-51. She also had a Baker's cyst on her right knee that had not been drained. Id. at 51.

Filichko had previous employment decorating cakes at Carvel and Cake Com, but she stopped working in 2006 because of her drug addiction.

**B.      Evidence of Psychiatric Impairments**

**i.      Evidence of Treatment & Opinions of Treating Sources**

On January 13, 2011, Filichko began treatment with Dr. Yelena Yermak for her psychiatric disorders. Yermak noted Filichko's constricted affect and depressed and anxious mood. Id. at 343. Filichko was adhedonic, isolative, low energy, anxious and overwhelmed. Id. Her thought process was logical, she lacked suicidal ideation, and had adequate insight and judgment. Id. Yermak diagnosed her with mood disorder, drug dependence and opioid dependence in remission, and opioid dependence, unspecified abuse. Id. Yermak prescribed Lexapro and individual therapy. Id. Later, she assessed major depressive disorder and switched Filichko's prescription from Lexapro to Cymbalta. Id. at 341. Filichko continued seeing Yermak regularly through September 2011, and Yermak consistently reported that Filichko's mood was depressed, anxious and irritable, her sleep was poor, her insight was limited or adequate, and her judgment was fair or adequate. Id. at 333-37. But, on at least one occasion, Filichko seemed to improve. On November 3, 2011, Yermak reported that Filichko was at "baseline," felt well, had a good mood and animated affect, slept well, and was "calm and friendly." Id. at 331.

Ronald Field, Ph.D., assessed Filichko with a history of bipolar disorder, drug addiction, and a history of physical abuse, suggesting possible post-traumatic stress disorder. AR at 427-28.[1] She saw him irregularly between May 2011 and February 2012. She complained of being jolted out of her sleep and waking up sweating and drooling. Id. at 429. She had problems with anxiety, depression, memory, concentration, and her ability to cope with stress. She had difficulty using public transportation or being in crowded places. Field recommended relaxation techniques to reduce stress levels. Id. There was a six month gap in sessions, but, in February 2012, Filichko was "still symptomatic despite medications." Id. at 430.

Field's functional capacity assessment described Filichko as anxious and depressed and reported that she suffered from PTSD, panic attacks, loss of sleep, and hypervigilance. Id. at 422. He estimated that her impairments and treatment would cause her to miss work more than three times per month. Id. at 423. He opined that she had an inadequate ability to remember work-like procedures, maintain attention for a two-hour segment, maintain regular attendance and punctuality, complete a normal work day and week without interruption from her impairments, and deal with normal work stress. Id. at 424. She also had an inadequate ability to interact appropriately with the public, maintain socially appropriate behavior, and use public transportation. Id. at 425. He rated her global assessment of functioning ("GAF") score as 58. Id. at 394. She had "constant" deficiencies of concentration that would result in failure to complete tasks in a work setting and could be expected to have "repeated" episodes of deterioration or decompensation at work. Id.

---

[1] Dr. Field's name is spelled "Fields" in parts of the record. See, e.g., AR at 421. He signs his name "Ronald Field," see, e.g., AR at 426, and the Court adopts that spelling.

### ii.     Consultative Examination

On April 12, 2011, Dr. Amy S. Cohen conducted a consultative examination of Filichko. She reported performing activities of daily living, including caring for personal hygiene, using public transportation, and socializing with friends. Id. at 366. She reported having a manic episode one week before the examination and a panic attack two weeks before. Id. at 363-64. Her thought process was coherent and goal directed, her sensorium was clear, her attention and concentration were intact, and her recent and remote memory skills were completely intact. Id. at 365-66. She passed concentration and memory tests without difficulty and was able to perform one-step and two-step mathematical word calculations, give perfect serial threes, recall three out of three objects after one minute and again after five minutes, and recite five digits backward and forward. Id. at 366. She had a dysphoric and depressed affect and a dysthymic mood. Cohen assessed bipolar disorder. Id. at 367. Filichko could "follow and understand simple instructions" and "perform simple tasks independently and with supervision." She could "maintain attention and concentration" and "learn some new tasks." But she could not "perform complex tasks independently or with supervision." She struggled "to make appropriate decisions, relate adequately with others, and appropriately deal with stress." Id. at 366. These results indicated psychiatric impairments that "may significantly interfere with her ability to function on a daily basis." Id. at 367.

### iii.     Other Opinion Evidence

Filichko submitted a functional capacity assessment by Dr. Diane Wetzel. Wetzel opined that Filichko was "unemployable," would suffer "frequent" deficiencies of concentration and "continual" episodes of deterioration that would prevent her from working appropriately. Id. at 407. Her examination revealed depressed mood, impaired short term memory, and fair impulse

control. Id. at 401. But she also noted good eye contact, cooperative attitude, and normal behavior, speech, thought processes, thought content, affect, sensorium, cognition, concentration, fund of information, intelligence, insight, and judgment. Id.

On May 13, 2011, state agency consultant Dr. H. Ferrin reviewed the medical record and completed a psychiatric review technique form and a mental residual functional capacity form. He concluded that Filichko had a medically determinable impairment, bipolar disorder, which did not satisfy the diagnostic criteria of the Social Security Listings. Id. at 372. He opined that she had mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Id. at 379. She would never experience repeated episodes of deterioration. Id. She had moderate limitations in her ability to maintain a schedule and regular work attendance, to complete a normal workday without interruptions from her symptoms, and to respond appropriately to changes in the work setting. Id. at 389-90. She would be able to understand and remember instructions, sustain attention and concentration for tasks, relate adequately with others, and adapt to change. Id. at 391.

### C.    Evidence of Physical Impairments

#### i.    Evidence from Treating Doctors

On June 22, 2010, Filichko fractured her left ankle. AR at 219-36. She underwent surgery on her left ankle and heel, and physicians believed they had successfully repaired the injury. Id. at 293-94, 329. After her cast was removed, she started walking with a protective boot and began a course of physical therapy, lasting from September through December 2010. Id. at 255-88, 304-07. She began feeling intense foot and ankle pain in January 2011, and a CT scan revealed incomplete healing of the bone and a screw that had backed out of position in the surgical

hardware. Id. at 308, 311-12. Dr. Kurt Voellmicke, her treating physician, opined that the injury would "permanently alter her lower extremity function." Id. at 314. Following surgery to replace the screw, she began using a cane and continued feeling pain but at a greatly reduced level. Id. at 348-50. She was prescribed a transcutaneous electrical nerve stimulation device to treat the pain since, as a recovering drug addict, she could not take prescription painkillers. Id. at 349-50.

In June 2012, Filichko stubbed her left foot and began walking with a crutch. Id. at 413-20. X-rays showed that she had broken three toes, and doctors instructed her to keep weight off the foot. Id. at 413. That course of treatment improved the injury, and, three weeks later, she was cleared to bear partial weight on her foot. Id. at 419.

### ii.    Consultative Examination

According to Dr. Suraj Malhotra's consultative examination, Filichko could cook, clean, do laundry, shop, maintain personal hygiene, and socialize with friends. Id. at 360. She had a mild limp on her left side, could not heel-walk or toe-walk, could fully squat, had normal station, and used a cane, left ankle brace, and walking boot. Id. She needed no help getting on or off the examining table or rising from a chair and had full strength, no muscle atrophy, no sensory abnormality, and normal reflexes. Id. at 361. She had a mild limitation of the range of motion in her left ankle with mild tenderness. Id. Malhotra assessed post-fracture of the left ankle, remote, with pain, and history of Baker's cyst in the right knee. Id. He opined that she would have a mild limitation in walking and bending the left ankle. Id.

### D.    Evidence from the Vocational Expert

Vocational expert Donald Slive testified that a hypothetical individual with Filichko's age, education, work experience, and mobility limitations, who could do sedentary work but would be off-task for five percent of the work day, could work as a final assembler, preparer, or

stone setter. Id. at 56-57. He testified that a person with the same limitations who would be off-task 15 percent of the time would be unable to work. Id.

## II.     Procedural History

### A.     The Commissioner's Decision

The ALJ found that Filichko suffered from severe impairments including bipolar disorder, polysubstance abuse, fractured left ankle, and Baker's cyst on her right knee. Id. at 15. But he decided that she was not disabled. He concluded she had "the residual functional capacity to perform sedentary work," would be "off task up to 5 percent of the day," and would be limited to "simple, routine and repetitive tasks performed in a low stress environment." Id. at 16-17. He observed that Filichko "complained of a highly limiting mental impairment," but there "is no indication within the record that these symptoms interfere with her mental functioning to the extent that it would preclude her from performing basic mental work-related activities as detailed in the residual functional capacity." Id. at 22. He noted an absence of psychiatric hospitalizations, emergency room visits, and episodes of decompensation, and observed that she could socialize with others and perform activities of everyday life. Id. Accordingly, he found her own description of her impairments not to be credible.

He refused to give controlling weight to the opinions of Field and Wetzel because their treatment notes did not "document the presence of significant mental limitations." Id. at 22. He gave significant weight to Cohen's findings that her psychiatric limitations would allow her to perform simple, repetitive tasks in a low-stress environment because they were consistent with the medical evidence as a whole. He also gave weight to Ferrin's similar assessment. Id. at 23.

He concluded that Filichko could not perform her past relevant work, but that given her age, education, work experience, and residual functional capacity, she could perform the jobs of

final assembler, preparer, and stone setter. Id. at 24-25. The Appeals Council denied Filichko's request for review. Id. at 1.

### B.      These Proceedings

Filichko seeks review of the Commissioner's decision under 42 U.S.C. § 405(g) and moves for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). She attacks the ALJ's residual functional capacity and credibility assessments, arguing that the ALJ overestimated her ability to maintain concentration at work. According to Filichko, the ALJ improperly weighed her treating source's opinion and improperly discredited her subjective complaints, and ultimately concluded, incorrectly, that she would lose concentration during only five percent of the workday. She argues that if the ALJ had credited her treating physician and her own subjective account of her mental impairment, the ALJ would have concluded that she would lose concentration during fifteen percent or more of the work day, which, according to the vocational expert, would make her unable to work. Filichko concedes that Wetzel was not a treating source, does not argue that the Commissioner erred at Step Three in finding that she did not meet the Listings criteria for a mental disability, and does not challenge the Commissioner's finding with respect to her physical limitations. The Commissioner cross-moves for judgment on the pleadings arguing that the ALJ's decision was supported by substantial evidence and free from legal error.

### DISCUSSION

## I.      Standard of Review

A motion for judgment on the pleadings should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am. (UPGWA) & Its Local 537, 47 F.3d 14, 16 (2d

Cir. 1995). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings

and transcript of the record, a judgment affirming, modifying, or reversing the decision of the

Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The

Commissioner's determination may be set aside only if it is based upon legal error or is not

supported by substantial evidence. Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). "Substantial

evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d

Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). If the findings of the

Commissioner as to any fact are supported by substantial evidence, those findings are

conclusive. Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995). See also Alston v. Sullivan, 904

F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the

determination is one to be made by the factfinder."). This means that if there is sufficient

evidence to support the final decision, the Court must grant judgment in favor of the

Commissioner, even if there also is substantial evidence for the plaintiff's position. See Brault v.

Comm'r of Soc. Sec'y, 683 F.3d 443, 448 (2d Cir. 2012).

## II.    Definition of Disability

A claimant is disabled under the Social Security Act if she demonstrates an "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A

determinable physical or mental impairment is defined as one that "results from anatomical,

physiological, or psychological abnormalities which are demonstrable by medically acceptable

clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). A claimant will be

determined to be disabled only if the impairments are "of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).

The Social Security Administration has established a five-step sequential evaluation process for making disability determinations. See 20 C.F.R. § 404.1520. The steps are followed in order: if it is determined that the claimant is not disabled at a step of the evaluation process, the evaluation will not progress to the next step. The Court of Appeals has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. Pt. 404, subpt. P, app. 1 [(the "Listings")] . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183-84 (2d Cir. 2003) (citation omitted). "The Social Security regulations define residual functional capacity as the most the claimant can still do in a work setting despite the limitations imposed by [her] impairments." Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013); see 20 C.F.R. § 404.1545. "The claimant bears the burden of proof in the first four steps of the sequential inquiry; the Commissioner bears the burden in the last." Selian, 708 F.3d at 418.

### III.     Treating Source Rule and Residual Functional Capacity

Filichko argues that the ALJ made an error of law by failing to give controlling weight to the opinion of her treating source. The resulting error, she claims, may have caused the ALJ to overestimate Filichko's ability to concentrate at work. At Step Four, the ALJ determined that Filichko had the residual functional capacity to do sedentary work with specific mental limitations, including being off-task no more than five percent of the work day. But Filichko's treating source reported that she would have "constant" deficiencies of concentration, and, had the ALJ credited the treating source's opinion, his assessment of her residual functional capacity might have been different.

The Social Security regulations require the ALJ to give controlling weight to the opinions of "treating sources" when those opinions are well-supported by medical evidence and "not inconsistent with the other substantial evidence." 20 C.F.R. § 416.927(c)(2). Treating sources "are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of impairments "and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations . . . ." Id. Even if the treating physician's opinion is contradicted by other substantial evidence, it should be entitled to "some extra weight" because "the treating source is inherently more familiar with a claimant's medical condition than are other sources." Schisler v. Bowen, 851 F.2d 43, 47 (2d Cir. 1988). But "the less consistent that opinion is with the record as a whole, the less weight it will be given." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).

When the ALJ discredits the opinion of a treating physician, he must follow a structured evaluative procedure and explain his decision. See Rolon v. Comm'r of Soc. Sec'y, 994 F. Supp.

2d 496, 506 (S.D.N.Y 2014). The ALJ must explicitly consider: (1) the length of the treatment

relationship and the frequency of the examination; (2) the nature and extent of the treatment

relationship; (3) the evidence that supports the treating physician's report; (4) the consistency of

the treating physician's opinion with the record as a whole; (5) the specialization of the physician

in contrast to the condition being treated; and (6) any other significant factors. 20 C.F.R.

§ 416.927(c)(2)–(6); Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013) (holding that "to

override the opinion of a treating physician . . . the ALJ must explicitly consider" these factors).

This process must be transparent: the regulations state that the Commissioner "will always give

good reasons in our notice of determination or decision for the weight we will give your treating

source's opinion." 20 C.F.R. § 416.927(c)(2). Where an ALJ does not credit a treating

physician's findings, the claimant is entitled to an explanation. Snell, 177 F.3d at 134. "The

failure to provide good reasons for not crediting the opinion of a claimant's treating physician is

a ground for remand." Greek v. Colvin, 820 F.3d 370, 375 (2d Cir. 2015) (internal quotation

marks omitted).

  The ALJ properly rejected Field's treating source opinion because it was "not supported

by the medical evidence of record as a whole, including treatment notes, which fail to document

the presence of significant mental limitations that would support these assessments and is

inconsistent with the level of activity purported by the claimant." AR at 22. Field claimed that

Filichko would suffer from repeated episodes of decompensation, but not a single past episode of

decompensation appears in the record and there is no other suggestion that decompensation was

on the horizon. In fact, Field's own assessment undermines this conclusion. In his treating notes,

Field consistently found Filichko to exhibit symptoms of depression and anxiety, but gave her a

GAF of 58, suggesting moderate symptoms such as "flat and circumstantial speech, occasional

panic attacks." See Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000). In short, neither the record nor Field's own medical opinion support his decompensation prognostication, and the ALJ properly dismissed it.

The ALJ also properly dismissed Field's assessment that Filichko would have continual difficulty maintaining concentration. The record evidence does not support Field's conclusion. Filichko's treatment notes dwell primarily on her depression and anxiety, and do not disclose any sustained difficulty in concentration. Yermak found Filichko depressed, anxious, and irritable, and described her as "overwhelmed." Field's notes indicate that Filichko suffered from nighttime "jolts" that disrupted her sleep, anxiety, and depression that he tried to control by teaching her relaxation techniques. AR at 429. But the treatment notes do not indicate that either professional tested Filichko's concentration. The only evidence that Filichko had difficulty concentrating was a single observation in Field's June 10, 2011 treatment notes that her concentration was impaired. Id. He treated her three times afterward and did not mention impaired concentration.

Field's assessment is also internally inconsistent. He assessed her with a GAF of 58, which is not consistent with continual difficulty maintaining concentration. He also assessed many of her mental abilities as "fair," including her ability to understand, remember, and carry out simple instructions; to sustain an ordinary routine; to work with others without distraction; to make simple decisions; to perform at a consistent pace without unreasonable breaks; to accept instructions and criticism; to get along with colleagues; to respond to changes in work routines; and to avoid hazards. AR at 424. At best, these assessments suggest mild impairments to her concentration.

Field's opinion was contradicted by the consultative examiners' findings. Cohen, who conducted the only recorded concentration test, concluded that Filichko could maintain

concentration and take simple directions, but that she could not follow complex directions. AR at 366. This conclusion was broadly consistent with Ferrin's, who found that Filichko suffered "moderate" limitations in her ability to sustain concentration. Id. at 389-90. The ALJ properly concluded that the consultative examiners' opinions were consistent with the record evidence and Field's was not.

Finally, the ALJ's failure to follow punctiliously the structured analysis described in 20 C.F.R. § 416.927(c) was not reversible error. "Remand is unnecessary" where "application of the correct legal standard could only lead to one conclusion." Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010) (internal quotation marks omitted). Here, the Court can glean findings under factors 3, 4, and 5 from the ALJ's opinion. The ALJ acknowledged that Field was an expert psychologist (factor 5), but rejected his opinion because it was not supported by record evidence and was inconsistent with the evidence as a whole (factors 3 and 4). Had the ALJ explicitly considered the other two factors, he would have come to the same conclusion. Factors 1 and 2 examine the length and nature of the treatment relationship and the frequency of examinations. Field treated Filichko regularly between May 19, 2011, and June 22, 2011, but only twice thereafter: once on January 31, 2012, and again on February 7, 2012, when he gave his functional capacity assessment. The seven-month gap in treatment undermines Field's analysis. Without regular opportunities to assess Filichko's progress, Field lacked the kind of longitudinal perspective on Filichko's impairments that would make a treating source's opinion more reliable than other medical opinions. In short, factors 1 and 2 support the ALJ's decision, and remand is not necessary to correct any error he might have made.

**IV.     Credibility Assessment**

Filichko argues that the ALJ improperly rejected her own account of her mental

impairments. It is the ALJ's role to evaluate a claimant's credibility and to decide whether to

discredit a claimant's subjective estimate of the degree of her impairment. Tejada v. Apfel, 167

F.3d 770, 775–76 (2d Cir. 1999); C.F.R. § 416.929(b). In making, credibility determinations, the

ALJ should consider "all of the available evidence" including the claimant's "history, the signs

and laboratory findings," and statements from the claimant and her treating source. C.F.R.

§ 416.929(c)(1). A court may set aside a credibility determination only when it is not supported

by substantial evidence. Aponte v. Sec., Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d

Cir. 1984).

The ALJ's credibility determination was supported by substantial evidence. The ALJ

concluded that Filichko's account of the severity of her mental impairments were not credible

because she had no history of hospitalization, decompensation, or serious mental illness and

could take public transportation, socialize with neighbors, drive a car, read, watch

documentaries, and manage her funds. AR at 22. Evidence that she could conduct activities of

daily living came from her own testimony and also from the reports of treating physicians and

consultative examiners. Such evidence can support an adverse credibility determination when a

claimant claims to be totally disabled. See, e.g., Rock v. Colvin, 628 F. App'x 1, 3 (2d Cir.

2015). Filichko also testified that her impairments diminished her ability to accomplish tasks of

daily living, but the Court may not evaluate the strength of the ALJ's credibility determination in

light of contradictory evidence. The Court may only weigh whether a credibility determination is

based on substantial evidence—even when substantial evidence also supports the claimant's

position. See Brault, 683 F.3d at 448. The ALJ's credibility determination rests on substantial evidence, and there is no basis to set it aside.

## V.        The ALJ's Step Five Analysis

Filichko contends that the ALJ's analysis at Step Five was not supported by substantial evidence. According to Filichko, the ALJ had no basis for deciding that she would be off-task 5 percent of the time rather than 15 percent of the time. As a result, she argues, the ALJ incorrectly adopted the vocational expert's opinion that she could work as a final assembler, preparer, or stone setter. (If the ALJ had concluded that she would be off-task 15 percent of the time, he should have adopted the vocational expert's opinion that she could not work.)

The ALJ's Step Five analysis was supported by substantial evidence. The ALJ heard testimony that Filichko could accomplish the tasks of daily life and testimony from experts that her difficulties with concentration were mildly to moderately impairing. No expert quantified the percentage of time Filichko would be off-task, but that degree of correspondence between the evidence in the record and the ALJ's opinion is not necessary for a substantial evidence review. The Court is limited to determining whether any reasonable person could conclude, based on this evidence, that Filichko retained the capacity to concentrate during work. The ALJ based his conclusion on record evidence, and there is no basis for overturning it.

## CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the pleadings should be granted, and Filichko's cross-motion for judgment on the pleadings should be denied.

**SO ORDERED.**

_____
SARAH NETBURN
DATED:    New York, New York                    United States Magistrate Judge
          April 27, 2016
                              *             *             *

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Alison J. Nathan at the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Nathan. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).